# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

ROBERT GRAY, ET AL.                                    CIVIL ACTION

VERSUS

THE CITY OF DENHAM SPRINGS,                    NO. 19-00889-BAJ-EWD
ET AL.

## RULING AND ORDER

Before the Court is the Motion To Dismiss For Failure To State A Claim And/Or For More Definite Statement Pursuant To FRCP 12 (Doc. 33), submitted by Defendants the City of Denham Springs, Denham Springs Police Department Chief J. Shannon Womack, and Berkshire Guard Insurance Companies (collectively, "Defendants"). Also before the Court is Defendants' Supplemental Motion To Dismiss And/Or For More Definite Statement Under FRCP 12 (Doc. 42), submitted after Plaintiffs amended their complaint to add new allegations regarding recent developments in their case. Plaintiffs oppose Defendants' Motions. (Doc. 45).

For the reasons stated herein, the Court will dismiss Plaintiffs' federal Section 1983 municipal liability claims against the City of Denham Springs; all claims against Police Chief Womack; and Plaintiffs' claims of conspiracy and abuse of process. Otherwise, Defendants' Motions will be denied.

## I. ALLEGED FACTS

This case alleges excessive force by police officers following a routine traffic stop. For present purposes, the following allegations are accepted as true:

Plaintiffs Robert Gray and Jacob Gray are father and son. On December 24,

1

JURY

2018—Christmas Eve—Robert (the father) drove to Don's Seafood in Denham Springs, Louisiana to pick up Jacob from work. (Doc. 41 at ¶ 7). As he neared Don's Seafood, two officers of the Denham Springs Police Department ("DPSD")—presently identified only as Defendants John Doe #1 and John Doe #2—observed that Robert's license plate light was burnt out and initiated a traffic stop. (*Id.* at ¶ 8).

Robert pulled over and the John Doe Officers approached his driver's side window. The Officers observed Robert exhibiting "erratic speech patterns and body movements," which caused them to believe that he was intoxicated. (*Id.* at ¶ 11). In fact, Robert was not intoxicated, and his unusual speech and body movements were caused by central pontine myelinolysis ("CPM"), a nerve disease that presents various symptoms, including "acute paralysis," an unstable gait, tremors, and difficulty swallowing and speaking. (*Id.* at ¶ 12). Robert attempted to explain his condition to the Officers, and even tried to present his handicap identification card, but the Officers ignored him, and repeatedly demanded that he exit his vehicle. (*Id.* at ¶¶ 12-13). Robert informed the Officers that, due to the uneven ground, "he would likely fall given his condition," but again the Officers demanded that he exit his car, and threatened to forcibly remove him if he did not comply.  (*Id.* at ¶ 14).

At that point, Robert called Jacob, "hoping that his son … would be able to better explain … his condition" to the Officers. (*Id.* at ¶ 15). Also around that time multiple additional DPSD officers—presently identified only as Defendants John Doe #4, John Doe #5, John Doe #6, John Doe #7, and John Doe #8—arrived at the scene. (*Id.* at ¶ 10).

When Jacob learned of the traffic stop, and "saw his father's SUV parked near his place of employment with numerous law enforcement officers surrounding it, he [Jacob] immediately rushed over to assist his father." (*Id.* at ¶ 15). As Jacob approached the scene, he observed Officers Doe #1 and Doe #2 forcibly removing Robert from his car. (*Id.* at ¶ 16). The other Officers did not intervene. (*Id.*).

Concerned, Jacob began recording his father's encounter with the Officers on his cellphone. (*Id.* at ¶ 17). Officer Doe #1 noticed Jacob recording and attempted to make him stop, first by forcing Jacob to move to the passenger side of his father's car (to block Jacob's view), and then by grabbing Jacob's phone from his hand, tackling him to the ground, and deploying pepper spray in his face. (*Id.* at ¶¶ 18-20). Still, the other Officers did not intervene. (*Id.*).

Although Jacob no longer possessed his phone, it continued to record, and even captured Jacob "scream from being pepper sprayed in his face." (*Id.* at ¶ 20). Eventually, one of the Officers noticed that the cellphone was still recording, stopped the recording, and tried to delete the video. (*Id.* at ¶ 21). Even though the "unknown officer hit 'delete,' the video was not permanently deleted; rather it went to the 'deleted photo/video album.'" (*Id.*).

After forcibly removing Robert from his car, the Officers conducted a search of the vehicle and discovered "a small amount of marijuana in the trunk." (*Id.* at ¶ 22). Thereafter, Robert was arrested for "Misdemeanor Possession of Marijuana, License Plate Light Required, Fake MVI Sticker, and Resisting an Officer." (*Id.* at ¶ 23). Jacob was arrested for "Resisting an Officer." (*Id.* at ¶ 24).

3

Robert later pleaded guilty to misdemeanor marijuana possession and the traffic infractions. The State entered a *nolle prossequi* on the charge of resisting an officer. (*Id.* at ¶ 25). The State "amended" the charges against Jacob from resisting an officer to  misdemeanor disturbing the peace. (*Id.*). Jacob pleaded *nolo contendre* to misdemeanor disturbing the peace. (*Id.*).

Plaintiffs each allege that they suffered injuries, financial losses, and other damages resulting from their encounter with the John Doe Officers. (*Id.* at ¶ 28).

## II. PROCEDURAL BACKGROUND

On December 24, 2019, Robert and Jacob initiated this action. The operative Second Amended Complaint (the "SAC") asserts constitutional claims of excessive force, infringement of speech, and unlawful search and seizure of personal property; discrimination under Title II of the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12132, and the Rehabilitation Act of 1973 ("RA"), 29 U.S.C. § 701, *et seq.*; and related state law claims, including abuse of process. (*See* Doc. 41 at 11-41).

On May 20, 2020, the City of Denham Springs (the "City"), Police Chief Womack, and Berkshire Guard Insurance Companies ("Berkshire")—the City's liability insurer—filed their original Motion to Dismiss, asserting that Plaintiffs' action must be dismissed in its entirety for multiple reasons, including that Plaintiffs' claims are legally barred under *Heck v. Humphrey*, 512 U.S. 477 (1994), due to Plaintiffs' convictions for criminal offenses arising from the December 24 encounter. (Doc. 33). On June 23, 2020, the City, Chief Womack, and Berkshire filed their Supplemental Motion To Dismiss And/Or For More Definite Statement Under FRCP 12 (Doc. 42), for the sole purpose of addressing Plaintiffs' new allegation—stated for

the first time in Plaintiffs' SAC (which was filed after Defendants' original Motion)—that Jacob "[pleaded] no contest to an amended charge of disturbing the peace (instead of pleading no contest to a charge of resisting an officer)." (Doc. 42-1 at 1). Defendants argue that "no matter the charge for which [Jacob] stands convicted, his Fourth Amendment excessive force claim still fails" under *Heck*. (*See id*.).

On July 17, 2020, Plaintiffs filed a single opposition addressing each of Defendants' Motions. (Doc. 45). Plaintiffs concede that Chief Womack "is not essential" to their action, and that their abuse of process claims may be dismissed. (*Id.* at 13-14, 36). Otherwise, Plaintiffs contest each of Defendants' arguments.

## III.  LAW AND ANALYSIS

### A. Standard

A Rule 12(b)(6) motion to dismiss tests the sufficiency of the complaint against the legal standard set forth in Rule 8, which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

When reviewing a Rule 12(b)(6) motion, the Court must accept all well-pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff. *Sonnier v. State Farm Mutual Auto Ins. Co.*, 509 F.3d 673, 675 (5th Cir.

2007).

## B. Discussion

### i. Preliminary Matters

#### a. The Court Will Not Consider Jacob Gray's Cellphone Video At This Stage

Defendants invite the Court to view Jacob Gray's cellphone video when considering their arguments, contending that it "so contradicts the version of events portrayed by plaintiffs, [that] the Court need not engage in an exercise of 'visible fiction' to give credence to and/or accept the facts as alleged [in the SAC]." (Doc. 33-1 at 15 & n.1). Plaintiffs also invite the Court to view Jacob's video. (*Id.* at 2 n.1).

The Court declines the Parties' invitation to view the video at this stage of the proceedings. Although Rule 12(d) allows the Court to consider "matters outside the pleadings" when addressing a Rule 12(b)(6) motion, the effect is to convert the motion to motion for summary judgment, in which case "the nonmoving party should be granted the protections of Rule 56." *Dillon v. Rogers*, 596 F.3d 260, 271 (5th Cir. 2010); *see also* Fed. R. Civ. P. 12(d).[1] Rather than inject contested interpretations of the events portrayed in the video—which would require allowing Plaintiffs to develop additional summary judgment evidence—the Court will exercise its discretion to disregard the video evidence at present, and consider Defendants' arguments based

---

[1] A *limited* exception to Rule 12(d) exists which allows the Court to consider *documents* attached to a motion to dismiss without converting the motion to a motion for summary judgment. *See Trinity Med. Servs.*, 2019 WL 3240048, at *5. Defendants have not presented any caselaw extending this limited exception to videos. On the contrary, the only case cited by Defendants for the proposition that the Court may consider the cellphone video at this stage, *Scott v. Harris*, 550 U.S. 372, 378-79 (2007), addresses the significance of video evidence at *summary judgment*. Plainly, *Scott* is inapposite.

on the well-pleaded allegations of the SAC. *See Trinity Med. Servs., L.L.C. v. Merge Healthcare Sols., Inc.*, No. 17-cv-592, 2019 WL 3240048, at *4 (M.D. La. July 18, 2019) (deGravelles, J.) ("A district court … enjoys broad discretion in deciding whether to treat a motion to dismiss as a motion for summary judgment.").

### b. The Court Will Dismiss Plaintiffs' Claims Against Chief Womack

As indicated above, Plaintiffs acknowledge, as they must, that their "official capacity" claims against Chief Womack are duplicative of their municipal liability claims against the City because Chief Womack is an employee of the City. *See Castro Romero v. Becken*, 256 F.3d 349, 355 (5th Cir. 2001) ("The district court was also correct in dismissing the allegations against all of the municipal officers and two of the employees of the Corps of Engineers in their official capacities, as these allegations duplicate claims against the respective governmental entities themselves."). As such, Plaintiffs' official capacity constitutional claims against Chief Womack will be dismissed

Additionally, the Court determines that Chief Womack is not necessary to Plaintiffs' state law *respondeat superior* claims. Defendants expressly admit that "the 'John Doe' officers are employees of the City of Denham Springs," rendering the City an adequate Defendant for the *respondeat superior* claims, too. (*See* Doc. 48 at 3-4). Accordingly, Plaintiffs' state law *respondeat superior* claims against Chief Womack will also be dismissed.[2]

---

[2] The SAC is confusing regarding whether Plaintiffs have also asserted individual capacity constitutional claims against Chief Womack. For example, the SAC's introductory paragraph states that Chief Womack is sued "in His Individual and Official Capacity as Chief of Police,"

7

### c.  The Court Will Dismiss Plaintiffs' Conspiracy Claim

Additionally, the Court will dismiss Plaintiffs' conspiracy claim. Although a conspiracy may be alleged as a mechanism through which to impose liability on multiple defendants for violations of the constitution and state law, a conspiracy claim fails absent proof of an *agreement* among the defendants. *Montgomery v. Walton*, 759 F. App'x 312, 314 (5th Cir. 2019) (a conspiracy claim under Section 1983 requires proof of "an agreement among the alleged co-conspirators to deprive [the plaintiff] of his constitutional rights"); *Currier v. Entergy Servs., Inc.*, No. 11-cv-2208, 2014 WL 4450360, at *2 (E.D. La. Sept. 10, 2014) (Feldman, J.) (a conspiracy claim under Louisiana law requires proof of an agreement to commit an unlawful act).

The SAC alleges in a single sentence, without elaboration, that "[a]t all times relevant hereto, all Defendants acted in concert and conspiracy and were jointly and severally responsible for the harms caused to Plaintiffs." (Doc. 41 at ¶ 3). There are no allegations whatsoever to establish that the Defendants specifically agreed to violate Plaintiffs' rights under federal or state law. Accordingly, Plaintiffs' purported

---

(Doc. 41 at 1), whereas elsewhere, the SAC states that Chief Womack is "sued in his official capacity" only, (*Id.* at ¶ 2). "In the Fifth Circuit … if it is not clear from allegations of the complaint whether a defendant has been sued in his official or individual capacity, the court must look to the substance of the claims, the relief sought, and the course of the proceedings to determine in which capacity the defendant is sued." *Senu-Oke v. Jackson State Univ.*, 521 F. Supp. 2d 551, 556 (S.D. Miss. 2007), *aff'd,* 283 F. App'x 236 (5th Cir. 2008). Here, the SAC contains no allegations whatsoever that Chief Womack participated in the events of December 24, 2018. Moreover, the substance of the claims and allegations against Chief Womack focus on actions he took in his "official capacity." *See* Doc. 41 at ¶ 31 ("In Chief Womack's official capacity, he was and is responsible for adopting, implementing, promulgating, and enforcing policies, customs, and practices pertaining to making arrest and preserving peace in the City of Denham Springs."). Accordingly, the Court exercises its discretion and determines that Chief Womack is sued in his official capacity only.

conspiracy claim will also be dismissed.

### d. Defendants fail to properly assert a qualified immunity defense

Generally, "adjudication of qualified immunity claims should occur at the earliest possible stage in litigation." *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002). In the opening pages of their Motion to Dismiss, Defendants reference qualified immunity, asserting that the John Doe Officers are shielded from liability because their conduct was "not objectively unreasonable," and because "the officers' handling of this traffic stop was [not] so obviously violative of anyone's constitutional rights." (*See* Doc. 33-1 at 16-17). Beyond these early references, however, Defendants fail to mention qualified immunity, much less brief the issue.

"Generally speaking, a defendant waives an issue if he fails to adequately brief it." *United States v. Martinez*, 263 F.3d 436, 438 (5th Cir. 2001). Moreover, this Court's Local Rules require that parties support their arguments with "a concise statement of reasons … and citations of authorities." M.D. La. LR 7(d). Here, Defendants fail to provide any argument or authorities whatsoever to support application of qualified immunity at this stage. "[T]he Court will not speculate on arguments that have not been advanced," or attempt to develop arguments on Defendants' behalf. *See Evans v. Mgmt. & Training Corp.*, No. 15-cv-770, 2017 WL 78803, at *3 (S.D. Miss. Jan. 6, 2017) (Jordan, J.). Pursuant to the Court's Local Rules, and consistent with the general rule that a party's failure to adequately brief an issue acts as a waiver, the Court determines that Defendants have waived a qualified immunity defense at this stage.

### ii.  Plaintiffs' Constitutional Claims

The SAC alleges three constitutional violations resulting from the December 24, 2018 encounter with the John Doe Officers: (1) Robert Gray and Jacob Gray suffered excessive force, (Doc. 41 at ¶¶ 38-65, 115-127); (2) Jacob Gray was deprived of his right to record police activities, and suffered retaliation as a result of his attempts to record policies activities, (*id.* at ¶¶ 74-114); and (3) Jacob Gray suffered an unlawful search and seizure when the Officers took his cellphone and attempted to delete his video without first obtaining a warrant. (*id.* at ¶¶ 128-37). Plaintiffs further allege that each of these violations occurred as the result of the City's failure to properly screen, train, and supervise the John Doe Officers. (*Id.* at ¶¶ 66-67, 138-39).

Defendants argue that Plaintiffs' constitutional claims must be dismissed in their entirety, whether directed at the City or the John Doe Officers individually.

### a.  Plaintiffs' Municipal Liability Claims Against The City Will Be Dismissed For Failure To Establish Deliberate Indifference

To establish a plausible municipal liability claim against the City, Plaintiffs must allege: (1) the City's screening, training, or supervising policies were inadequate, (2) the City was deliberately indifferent in adopting these policies, and (3) these inadequate policies directly caused the constitutional deprivations at issue. *Sanders-Burns v. City Of Plano*, 594 F.3d 366, 381 (5th Cir. 2010).

Relevant here, "[d]eliberate indifference is more than mere negligence." *Id.* at 381 (quotation marks omitted). Plaintiffs must show that "in light of the duties assigned to specific officers or employees, the need for more or different [screening,

training, and/or supervising] is obvious, and the inadequacy so likely to result in violations of constitutional rights, that the policymakers of the city can reasonable be said to have been deliberately indifferent to the need." *City of Canton,* 489 U.S. at 390.

> Finally, a showing of deliberate indifference is difficult, although not impossible, to base on a single incident. Claims of inadequate [screening, training, and/or supervising] generally require that the plaintiff demonstrate a pattern. Notice of a pattern of similar violations is required. The prior acts must be fairly similar to what ultimately transpired and, in the case of excessive use of force, that the prior act must have involved injury to a third party. The "single incident exception" is narrow and to rely on the exception a plaintiff must prove that the highly predictable consequence of a failure to [screen, train, or supervise] would result in the specific injury suffered, and that the failure to [screen, train, or supervise] represented the moving force behind the constitutional violation.

*Sanders-Burns*, 594 F.3d at 381 (quotation marks and citations omitted).

Here, Plaintiffs' SAC fails to allege that that the constitutional deprivations they suffered on December 24, 2018 were the obvious or highly predictable consequence of the City's failure to screen, train, or supervise the John Doe Officers. Plaintiffs also fail to identify a pattern of similar constitutional violations by unscreened, untrained, or unsupervised officers. As such, the Court must dismiss Plaintiffs' municipal liability claims against the City for failure to adequately allege deliberate indifference. *See Sanders-Burns*, 594 F.3d at 381.

### b. Plaintiffs' Personal Capacity Claims Against The John Doe Officers May Proceed

Defendants contend that Plaintiffs' allegations are too vague and conclusory to state plausible constitutional claims against the individual John Doe Officers; that Plaintiffs' claims, even if actionable, are barred by *Heck v. Humphrey*; and,

alternatively, that Jacob Gray's First Amendment retaliation claim is barred under *Nieves v. Bartlett*. The Court considers each argument in turn.

### 1. The SAC Alleges Actionable Fourth Amendment Excessive Force Claims

The Fourth Amendment protects individuals against police officers' excessive or unreasonable use of force. *Graham v. Connor*, 490 U.S. 386, 394 (1989). To prevail on an excessive force claim, "[a] plaintiff must show (1) an injury, (2) which resulted directly and only from the use of force that was clearly excessive, and (3) the excessiveness. . . was clearly unreasonable." *Collie v. Barron*, 747 Fed. Appx. 950, 953 (5th Cir. 2018) (citations omitted).

> Excessive force claims are necessarily fact-intensive; whether the force used is "excessive" or "unreasonable" depends on the facts and circumstances of each particular case. Factors to consider include the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

*Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009).

Applying these factors, Robert Gray plainly states an excessive force claim against the John Doe Officers. Robert alleges he was stopped for a minor traffic infraction, making the need for force substantially lower than if he had been suspected of a serious crime. He posed no objective threat to the Officers, remained in his vehicle as the Officers approached, and responded to the Officers' questions regarding possible intoxication by explaining that his speech and body movements were due to a chronic medical condition. He repeatedly offered to show the Officers his "handicap identification card," and pleaded that if he was forced to get out of the vehicle he would likely fall. The John Doe Officers ignored Robert's explanations and

pleas, and then forcibly removed him from his vehicle, causing physical injuries. At no point did Robert resist arrest or attempt to flee. Viewing the allegations in Robert's favor, the degree of force employed against him was not justified under the circumstances. *See, e.g.*, *Deville*, 567 F.3d at 167 (plaintiff's excessive force claim survived summary judgment where officer pulled her from vehicle following minor traffic infraction).

Likewise, Jacob Gray states a plausible excessive force claim. Jacob alleges that he approached the scene of the traffic stop after receiving his father's call for help, observed his father being forcibly removed from his car, pulled out his cellphone, and started to record. When the Officers saw Jacob recording, they forced him to the opposite side of Robert's car, where they grabbed his cellphone from his hand, tackled him to the ground, and pepper sprayed him in the face. At the time, Jacob had committed no crime, posed no threat to anyone's safety, and was not attempting to flee. Here, again, viewing the allegations in Jacob's favor, the degree of force employed against him was not justified. *See Newman v. Guedry*, 703 F.3d 757, 764 (5th Cir. 2012) (plaintiff's excessive force claim survived summary judgment where plaintiff committed no crime, posed no threat to anyone's safety, and did not resist the officers or fail to comply with a command before officers struck him with a baton).

### 2.  The SAC Alleges Actionable First Amendment Claims

"The First Amendment prohibits not only direct limits on individual speech but also adverse governmental action against an individual in retaliation for the exercise of protected speech activities." *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002). Relevant here, the First Amendment protects an individual's "right to record the

police … subject only to reasonable time, place, and manner restrictions." *Turner v.*

*Lieutenant Driver*, 848 F.3d 678, 688 (5th Cir. 2017).

"Importantly, an individual's exercise of her First Amendment right to film

police activity carried out in public, including a traffic stop, necessarily remains

unfettered unless and until a reasonable restriction is imposed or in place." *Gericke*

*v. Begin*, 753 F.3d 1, 8 (1st Cir. 2014); *Turner*, 848 F.3d at 690 n.50 (same).

> The circumstances of some traffic stops, particularly when the detained
> individual is armed, might justify a safety measure—for example, a
> command that bystanders disperse—that would incidentally impact an
> individual's exercise of the First Amendment right to film. Such an
> order, even when directed at a person who is filming, may be appropriate
> for legitimate safety reasons. However, a police order that is specifically
> directed at the First Amendment right to film police performing their
> duties in public may be constitutionally imposed only if the officer can
> reasonably conclude that the filming *itself* is interfering, or is about to
> interfere, with his duties.

*Gericke*, 753 F.3d at 8 (emphasis added).

Jacob Gray alleges that he was on a public street, peaceably filming the traffic

stop, when Officers forced him to the opposite side of Robert's car, grabbed his

cellphone from his hand, tackled him to the ground, and pepper sprayed him in the

face. As alleged, Jacob was not interfering with the Officers' duties when these events

occurred, and no additional safety concerns justified the Officers' actions. On the

contrary, Jacob alleges that the Officers' actions were specifically intended "to

retaliate against him for being present as an observer and/or documenting (via

cellphone video-recoding)" the traffic stop. (Doc. 41 at ¶ 99). Here, again, Jacob plainly

states plausible constitutional violations of his First Amendment rights to record his

father's traffic stop, and to be free from retaliation when doing so. *See Turner*, 848

F.3d at 688; *Gericke*, 753 F.3d at 8.

### 3. The SAC Alleges An Actionable Fourth Amendment Search And Seizure Claim

The Fourth Amendment also protects individuals from unreasonable searches and seizures of "their persons, houses, papers, and effects." *Soldal v. Cook Cty., Ill.*, 506 U.S. 56, 62 (1992). "[T]he Amendment protects property as well as privacy," *id.*, and its protections unmistakably extend to cellphones and the data stored on them. *Riley v. California*, 573 U.S. 373, 401-02 (2014).

The "ultimate touchstone" of the Fourth Amendment is "reasonableness," which  generally requires an officer to obtain a warrant before engaging in a search or seizure. *Id.* at 381–82. "In the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement." *Id.*  Relevant here, the "search incident to arrest exception" to the warrant requirement "does not apply to cell phones." *Id.* at 405. Other exceptions may still apply, however, such as when "when 'the exigencies of the situation' make the needs of law enforcement so compelling that a warrantless search is objectively reasonable." *Id.* (quotation marks omitted).

> Such exigencies could include the need to prevent the imminent destruction of evidence in individual cases, to pursue a fleeing suspect, and to assist persons who are seriously injured or are threatened with imminent injury.

*Id.* at 402.

Here, Jacob Gray alleges that the John Doe Officers "physically removed [his] cellphone from his hand"—*i.e.*, *seized* Jacob's phone—"[w]ithout any legal provocation or justification," specifically to prevent him from exercising his lawful right to film

his father's traffic stop. (Doc. 41 at ¶¶ 19, 99). Thereafter, when they realized that the phone was still recording, the Officers "stopped the recording and attempted to delete the video"—*i.e.*, *searched* Jacob's phone. (*Id.* at ¶ 21). The John Doe Officers never obtained a warrant to seize or search Jacob's phone, and, as stated, "the search incident to arrest exception does not apply." *Riley*, 573 U.S. at 401. Further, viewed in the light most favorable to Plaintiffs, no exigencies eliminated the warrant requirement, such as the need to prevent destruction of evidence, locate or pursue a fleeing suspect, or identify or prevent serious injury or death. *Id.* Here, again, Jacob Gray states a plausible constitutional violation.

### c. Plaintiffs' Constitutional Claims Are Not Barred By *Heck v. Humphrey's* "Favorable Termination Rule"

Next, Defendants contend that as a result of their convictions, Plaintiffs' constitutional claims are barred by *Heck v. Humphrey's* "favorable termination rule."

The favorable termination rule dictates that a plaintiff's Section 1983 claim must be dismissed if, ultimately, a judgment in the plaintiff's favor on the claim "would necessarily imply the invalidity" of a criminal conviction arising from the same set of facts. *Ballard v. Burton*, 444 F.3d 391, 397 (5th Cir. 2006). In other words, the favorable termination rule bars a Section 1983 claim "if the underlying criminal offense and the alleged constitutional deprivation cannot legally co-exist." *Davis v. E. Baton Rouge Sheriff's Off.*, No. 08-cv-00708, 2016 WL 2347893, at *2 (M.D. La. May 2, 2016) (Jackson, J.).

Applied here, the favorable termination rule plainly does not bar Robert Gray's excessive force claim. Robert ultimately pleaded guilty to misdemeanor marijuana

possession and two minor traffic infractions. (Doc. 41 at ¶ 25). Robert's allegations that the John Doe Officers used unreasonable force during his traffic stop, *prior to* discovery of the marijuana in Robert's trunk, can legally coexist with these convictions. *See, e.g.*, *Davis*, 2016 WL 2347893, at *2 (under *Heck*, plaintiff's conviction for cocaine possession did not bar excessive force claim related to underlying traffic stop (citing authorities)).

Jacob Gray ultimately pleaded *nolo contendre* to misdemeanor disturbing the peace, in violation of La. R.S. 14:103. (Doc. 41 at ¶ 25). In relevant part, La. R.S. § 14:103 prohibits fist fights and creating a nuisance with the express intent "to deride, offend, or annoy [any person], or to prevent him from pursuing his lawful business, occupation, or duty." La. R.S. § 14:103(A)(1), (3). Still, despite the wide range of activities proscribed by § 14:103, the Court determines that the favorable termination rule does not bar Jacob Gray's Section 1983 claims at this stage. As discussed, Jacob's constitutional claims are interrelated, and center on his allegations that he was *lawfully and peaceably* recording the traffic stop when the John Doe Officers assaulted him and took his phone. Put differently, Jacob's allegations establish that *prior to* the Officers' alleged assault, Jacob was engaged in constitutionally protected activity, and was not creating any physical or verbal disturbance, or preventing the Officers from doing their jobs, as is required to sustain a conviction for disturbing the peace under § 14:103. Thus, the predicate facts underlying Jacob's conviction for disturbing the peace necessarily arose *after* the Officers' alleged assault. As such, the alleged facts underlying Jacob's constitutional

claims are temporally and conceptually distinct from the facts underlying his conviction, and a judgment in his favor would not be "inherently inconsistent" with his conviction. *See Thomas v. Pohlmann*, 681 F. App'x 401, 408 (5th Cir. 2017) (finding that plaintiffs' excessive force claim was not "inherently inconsistent" with their convictions for disturbing the peace where plaintiffs' disturbing the peace convictions resulted from their pre-arrest conduct); *Cf. Bush v. Strain*, 513 F.3d 492, 499-500 (5th Cir. 2008) (finding that plaintiff's excessive force claim was not barred under *Heck* by her conviction for resisting arrest because "the fact findings essential to her criminal conviction [were] not inherently at odds with" her excessive force claim, and therefore "a favorable verdict on her excessive force claims [would] not undermine her criminal conviction." (discussing cases); *Ballard*, 444 F.3d at 397-401 (finding that plaintiff's conviction of simple assault of a law enforcement office was "not inconsistent" with his claim of excessive force (discussing cases)).[3]

---

[3] The fact that Robert and Jacob were each initially charged with resisting an officer does not change the Court's analysis. The Louisiana Supreme Court has held that prosecutorial decisions *not* to proceed with a particular charge result in "a *bona fide* termination" for purposes of *Heck's* favorable termination rule, *unless*

> the charge is dismissed pursuant to an agreement of compromise, because of misconduct on the part of the accused or in his behalf for the purpose of preventing trial, out of mercy requested or accepted by the accused, because new proceedings for the same offense have been instituted and have not been terminated favorably to the accused, or when the dismissal is due to the impossibility or impracticality of bringing the accused to trial.

*Lemoine v. Wolfe*, 2014-1546 (La. 3/17/15), 168 So. 3d 362, 364.

Here, Plaintiffs allege that Robert's resisting an officer charge terminated with a *nolle prosequi*, and that Jacob's charge terminated when the State "amended" the charge to disturbing the peace. Viewing the allegations most favorably to Plaintiffs, the Court determines for present purposes that Plaintiffs each allege "a *bona fide* termination" of their resisting an officer charges, allowing their constitutional claims to proceed. *Lemoine*, 168 So. 3d at 364.

### d. Jacob Gray's First Amendment Retaliation Claim Is Not Barred By *Nieves v. Bartlett*

Likewise, Jacob Gray's First Amendment retaliation claim is not barred at this stage by *Nieves v. Bartlett*. *Nieves* instructs that a Section 1983 plaintiff cannot pursue a claim of retaliatory arrest in violation of the First Amendment when the summary judgment evidence shows that police had probable cause to make an arrest. 139 S. Ct. 1715, 1728 (2019); *see also Roy v. City of Monroe*, 950 F.3d 245, 255 (5th Cir. 2020) (discussing *Nieves* and related cases). *Nieves* is distinguishable in two respects. First, it addresses a claim of retaliatory *arrest*. Here, by contrast, Jacob alleges retaliatory *excessive force*. As explained above, the issue of whether the John Doe Officers engaged in unlawful and excessive force to prevent Jacob from filming the traffic stop is temporally and conceptually distinct from the issue of whether probable cause to arrest Jacob for disturbing the peace arose *after* the Officers took his phone, tackled him to the ground, and sprayed him with mace.

Second, *Nieves* was decided at summary judgment, after development of evidence proving that police had probable cause to arrest the plaintiff for drunken conduct and resisting arrest. Here, no such evidence is presently before the Court. Rather, Jacob *alleges* that he was peaceably and lawfully recording the traffic stop when he suffered retaliation. For present purposes, Jacob's allegations are sufficient. *See Roy*, 950 F.3d at 255 ("To prevail on a First Amendment retaliation claim … plaintiffs must *plead* and prove the absence of probable cause." (emphasis added)).

### iii. Robert Gray's ADA Claims

Robert Gray alleges two forms of prohibited discrimination resulting from his

encounter with the John Doe Officers: (1) the John Doe Officers failed to accommodate Robert's CPM, and (2) the John Doe Officers directly discriminated against Robert on the basis of his CPM, each in violation of the RA and Title II of the ADA. (Doc. 41 at ¶ 49). Defendants challenge each claim, arguing that the John Doe Officers were allowed to conduct the traffic stop "without consideration of the [ADA]," and, alternatively, that Robert's allegations are legally insufficient. (Doc. 33 at 2).

Here, again, Defendants' arguments miss the mark. First, the ADA and RA undoubtedly apply to police encounters, including traffic stops. *See Delano-Pyle v. Victoria Cty., Tex.*, 302 F.3d 567, 576 (5th Cir. 2002) (evidence supported claim of intentional discrimination in violation of the ADA and the RA where sheriff's deputy failed to adequately accommodate plaintiff's hearing impairment when conducting a field sobriety test after a traffic stop).

Second, Robert has alleged a *prima facie* case of discrimination, allowing his claims to proceed. In support of his failure to accommodate claims, Robert alleges (1) he suffers from CPM, a qualifying disability under the ADA, *see Clark v. Champion Nat'l Sec., Inc.*, 952 F.3d 570, 578 n.15 (5th Cir. 2020) ("Congress expanded the definition of 'disability' and instructed courts to construe that definition 'broadly.'"); (2) the John Doe Officers knew of this disability and its consequences; and, yet, (3) the John Doe Officers persisted in their demands that Robert exit his vehicle despite the risk the he would fall, and, when Robert failed to immediately comply, forcibly removed him from his vehicle. Further, Plaintiffs' allegations establish that no exigent circumstances existed which would have allowed the officers to disregard

20

Robert's right to reasonable accommodations. *See Windham v. Harris Cty., Texas*, 875 F.3d 229, 235 (5th Cir. 2017) (the ADA and RA "allow individuals to sue local governments for disability discrimination committed by police in non-exigent circumstances.").

To state a claim for direct discrimination under the ADA, Robert must allege "(1) that he has a qualifying disability; (2) that he is being denied the benefits of services, programs, or activities for which the public entity is responsible, or is otherwise discriminated against by the public entity; and (3) that such discrimination is by reason of his disability." *Hale v. King*, 642 F.3d 492, 499 (5th Cir. 2011). Notably, direct "[d]iscrimination under the ADA and Rehabilitation Act may include a defendant's failure to make reasonable accommodations to the needs of a disabled person." *Wright v. Texas Dep't of Criminal Justice*, No. 13-cv-0116, 2013 WL 6578994, at *3 (N.D. Tex. Dec. 16, 2013) (citing authorities).

Here, again, Robert's allegations establish his *prima facie* case: (1) he has a qualifying disability (CPM); (2) he was denied access to reasonable accommodations during his traffic stop; and (3) the discrimination—specifically, John Doe Officers' failure to accommodate his disability-based concerns about exiting his vehicle—is the direct result of his CPM. *See Wright*, 2013 WL 6578994, at *3-*4.

### iv.  Plaintiffs' State Law Claims

As stated, Plaintiffs concede that their state law abuse of process claims must be dismissed. (Doc. 45 at 8, 36). Accordingly, these claims will be dismissed.

What remains are Plaintiffs' claims of battery, intentional infliction of emotional distress, intentional misrepresentation, malfeasance in office, and

attempted obstruction of justice against the individual John Doe Officers, (Doc. 41 at ¶¶ 69, 141), and Plaintiffs' claims of *respondeat superior* liability and negligent hiring, retention, and supervision against the City. (*Id.* at ¶¶ 72, 144). Among these, Defendants only challenge Plaintiffs' battery claims, arguing that they are barred by *Heck*. (*See* Doc. 33-1 at 67-70).[4]

Plaintiffs' state law battery claims are subject to essentially the same analysis as their Fourth Amendment excessive force claims. *See Elphage v. Gautreaux*, 969 F. Supp. 2d 493, 515 (M.D. La. 2013) (Dick, J.) (citing authorities). Having determined that Plaintiffs' excessive force claims are plausibly alleged and survive *Heck*, the Court further determines that Plaintiffs' state law battery claims may also proceed.

### v.  More Definite Statement

As an alternative to dismissal, Defendants request a more definite statement of Plaintiffs' claims under Rule 12(e). Having determined that Plaintiffs' allegations are not conclusory and state actionable claims, the Court determines that a "more definite statement" is unnecessary, and denies Defendants' request.

### vi.  Amendment

Plaintiffs request the opportunity to amend the SAC to the extent any claims are dismissed. (Doc. 45 at 10). When, as here, the deadline to amend has passed, amendment may be granted "only for good cause and with the judge's consent." Fed. R. Civ. P. 16. Plaintiffs have already amended their complaint twice, and fail to make

---

[4] Defendants' assert in their Motion to Dismiss that Plaintiffs' state law claims must all be dismissed, (Doc. 33 at 2), but fail to provide any briefing or authorities as to any claims except battery and abuse of process. Here, again, the Court will not speculate or develop arguments on Defendants' behalf. *See* Section III(B)(i)(d), *supra*.

any showing that amending a third time will sufficiently address the deficiencies identified herein. As such, Plaintiffs have failed to show good cause and their request to amend shall be denied.

## IV. CONCLUSION

Accordingly,

**IT IS ORDERED** that Defendants' Motion To Dismiss For Failure To State A Claim And/Or For More Definite Statement Pursuant To FRCP 12 (Doc. 33) and Supplemental Motion To Dismiss And/Or For More Definite Statement Under FRCP 12 (Doc. 42), are each **GRANTED IN PART**. Specifically, the Court dismisses Plaintiffs' federal Section 1983 municipal liability claims against the City of Denham Springs; dismisses all claims against Police Chief Womack; and dismisses Plaintiffs' claims of conspiracy and abuse of process. In all other respects, Defendants' Motions are **DENIED**.

**IT IS FURTHER ORDERED** that the parties' Joint Motion To Continue Trial And Extend Deadlines (Doc. 52) is **GRANTED**, and that the jury trial currently set to begin August 23, 2021 be and is hereby **CONTINUED**.

**IT IS FURTHER ORDERED** that this matter is referred to the Magistrate Judge for selection of a new trial date and entry of a revised scheduling order.

Baton Rouge, Louisiana, this 29th day of March, 2020

**JUDGE BRIAN A. JACKSON**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**